EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

Nicholas Elgar

               Plaintiff,

         CENTER

     -against-

Seafield ~~Services~~ Inc.

Seafield Services, Inc.

Lynn Doris, MBA, LCSW, CASAC


             Defendants.

----------------------------------------------------------X

**AMENDED**
**COMPLAINT**

18     00591       ARL

_____ CV _____ ( JFB ) (_____ )

✴FILED✴

2018 JUN -7 PM 11: 47

CLERK
U.S. DISTRICT COURT
E.D.N.Y.


**RECEIVED**

JUN 1 3 2018

**EDNY PRO SE OFFICE**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____Nicholas Elgar

_____

_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

   -against-

___Seafield Center, Inc.

   Seafield Services,Inc.


Lynn Doris, MBA, LCSW, CASAC

Executive Director, Seafield Out Patient, 212 West
Main Street, Riverhead, Suffolk County, NY 11901

_____

_____

_____

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

AMENDED
**Complaint for Employment
Discrimination**

Case No. _____

*(to be filled in by the Clerk's Office)*

Jury Trial:   **X** Yes ☐ No

   *(check one)*

★FILED★
2018 JUN -7 PM 11:47
CLERK
U.S. DISTRICT COURT
E.D.N.Y.
RIVERHEAD OFFICE

RECEIVED
JUN 1 3 2018
EDNY PRO SE OFFICE

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | _Nicholas Elgar |
| Street Address | _200 West 70 Street, Suite 9G, |
| City and County | _New York, New York County, |
| State and Zip Code | _NY 10023 |
| Telephone Number | _(917) 584-1802 |
| E-mail Address | _nickelgar1@gmail.com_ |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | _Seafield Center, Inc. |
| Job or Title (if known) | |
| Street Address | _7 Seafield Lane |
| City and County | _Westhampton Beach, Suffolk County, |
| State and Zip Code | _NY 11978 |

18 - CV - 00591 (JFB) (ARL)

## B) The Defendant(s)

Lynn Doris, MBA, LCSW, CASAC
Executive Director
Seafield Out Patient
212 West Main Street,
Riverhead, Suffolk County,
NY 11901
(631) 369-7800

PERSONAL

LYNN DORIS
104 McGAW AVENUE
LAKE GROVE
NY 11755

Telephone Number  (631) 288-1122

E-mail Address
(if known)

Defendant No. 2

Name    _Seafield Services, Inc.

Job or Title
(if known)

Street Address  _7 Seafield Lane

City and County  _Westhampton Beach, Suffolk County,

State and Zip Code  _NY 11978

Telephone Number  _(631) 288-1122

E-mail Address
(if known)

## C.   **Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is:

Name    _Seafield Out Patient – Riverhead

Street Address  _212 West Main Street

City and County  _Riverhead, Suffolk County,

State and Zip Code  _NY 11901

Telephone Number  _(631) 369-7800

## II.   Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☐   Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

X   Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

**X**   Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

X   Other federal law *(specify the federal law)*: ___ _

*Please see attached additional pages.*

_____

☐   Relevant state law *(specify, if known)*:

_____

☐   Relevant city or county law *(specify, if known)*:

_____

## III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach

additional pages if needed.

A.  The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

    **X**    Failure to hire me.

    **X**    Termination of my employment.

    ☐    Failure to promote me.

    **X**    Failure to accommodate my disability.

    **X**    Unequal terms and conditions of my employment.

    **X**    Retaliation.

    **X**    Other acts *(specify)*: "Demotion" from Full Time Employment to Part Time Employment Status Only. "Unpaid Overtime."

_____

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.  It is my best recollection that the alleged discriminatory acts occurred on date(s)

December 02, 2016

C.  I believe that defendant(s) *(check one)*:

    **X**    is/are still committing these acts against me.

    ☐    is/are not still committing these acts against me.

D.  Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

    ☐    race _____

    ☐    color_____

    ☐    gender/sex _____

    ☐    religion _____

    ☐    national origin _____

    X    age. My year of birth is _1958_____. *(Give your year of birth only if you are asserting a claim of age discrimination.)*

    **X**    disability or perceived disability *(specify disability)*

Attention Deficit Disorder (ADD) _
*Please see attached additional pages for explanation.*

_____

E.    The facts of my case are as follows.  Attach additional pages if needed.

*_Please see attached additional pages.*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

**IV.    Exhaustion of Federal Administrative Remedies**

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

September 22, 2017.

_____

B.    The Equal Employment Opportunity Commission *(check one)*:

□    has not issued a Notice of Right to Sue letter.

**X**    issued a Notice of Right to Sue letter, which I received on *(date)*
November 04, 2017.

6

C.  Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

X  60 days or more have elapsed.

☐  less than 60 days have elapsed.

## V.  Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Lost Wages – Amount Unknown.

"Pain & Suffering" – Amount Unknown.

Unpaid Overtime – Amount Unknown.

Loss of Benefits, including, but not limited to, Health Insurance, and Dental Insurance, for Plaintiff & Spouse. – Amount Unknown.

Legal Fees – Amount Unknown.

"…wrongs alleged are continuing at the present time," due to, "Failure to hire me," to a Full Time Position.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: ___JUNE 06,___ 2018__ .

Signature of Plaintiff _____  NICHOLAS ELGAR

Printed Name of Plaintiff ____Nicholas Elgar_____

AMENDED COMPLAINT
MAILED FIRST CLASS TO:

- SEAFIELD CENTER, INC.
- SEAFIELD SERVICES, INC
- LYNN DORIS - WORK & PERSONAL
- JACKSON LEWIS, P.C.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
NICHOLAS ELGAR,                                      :
                                                     :
                          Plaintiff,                 :
                                                     :          **ORDER**
              -against-                              :          18-CV-00591 (JFB)(ARL)
                                                     :
SEAFIED CENTER, INC., SEAFIELD SERVICES, INC., :
LYNN DORIS,                                          :
                                                     :
                          Defendants.                :
-------------------------------------------------------------------X
JOSEPH F. BIANCO, District Judge:

     The Court's records reflect that the complaint in this action was filed on January 26, 2018.

Rule 4(m) of the Federal Rules of Civil Procedure provides:

> If a defendant is not served within 90 days after the complaint is
> filed, the court – on motion or on its own after notice to the plaintiff
> – must dismiss the action without prejudice against that defendant
> or order that service be made within a specified time. But if the
> plaintiff shows good cause for the failure, the court must extend the
> time for service for an appropriate period.

     Accordingly, if service is not made upon the defendants by **April 26, 2018,** or plaintiff fails

to show good cause why such service has not been effected, the complaint will be dismissed

without prejudice. **Plaintiff is to provide a copy of this Order to the defendants along with**

**the summonses and complaint, and shall file proof of service with the Court.**

     Plaintiff is required to advise the Clerk of Court of any changes of address. Failure to

keep the Court informed of plaintiff's current address may result in dismissal of the case.


**SO ORDERED.**

Dated:    February 2, 2018
          Central Islip, New York

                                 Joseph F. Bianco
                                 United States District Judge

# UNITED STATES DISTRICT COURT
### for the

Eastern District of New York

| | |
|---|---|
| Nicholas Elgar | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | )      Civil Action No.   18-CV-00591   (JFB)   (ARL) |
| Seafield Center, Inc.; Seafield Services, Inc.; | ) |
| Lynn Doris, MBA, LCSW, CASAC | ) |
| Executive Director, Seafield Out Patient, | ) |
| Riverhead, NY | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*
    1) Seafield Center, Inc., 7 Seafield Lane, Westhampton Beach, Suffolk County, NY 11978

    2) Seafield Services Inc., 7 Seafield Lane, Westhampton Beach, Suffolk County, NY 11978

    3) Lynn Doris, MBA, LCSW, CASAC, Executive Director, Seafield Out Patient, 212 West Main Street, Riverhead, Suffolk County, NY 11901

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

    Pro Se:

    Nicholas Elgar, 200 West 70th Street, Suite 9G, New York, NY 10023

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date:   APR 2 5 2018      _____
                                             *Signature of Clerk or Deputy Clerk*

18— CV — 00591 (JFB)(ARL)



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5ᵗʰ Floor
New York, NY 10004-2112
District Office: (212) 336-3620
TTY (212) 336-3622

Ashraf Ahmed
Federal Investigator

Mr. Nicholas Elgar
45 Oneck Lane
West Hampton Beach, NY 11978

       Re: *Elgar v. Seafield Services, Inc.*
       *EEOC Charge No. 520-2017-03695*

Dear Mr. Elgar:

The U.S. Equal Employment Opportunity Commission (hereinafter referred "Commission") has reviewed above-captioned job discrimination complaint according to case prioritization procedures surrounding open investigations. Consequently, the Commission focuses available staff resources only on those cases most likely to result in violation determination(s) of laws it enforces.

In accordance with such standards, the Commission evaluated said charge based upon factual information and/or investigative evidence collected. Pursuant to this evaluation, the Commission can not conclude that you were subjected to an adverse employment action motivated by discriminatory animus as defined under the Commission's guidelines and federal law.

In sum, the charge alleges that Respondent, Seafield Services, Inc., discriminated against you on account of disability and retaliation nexus to denial of a requested accommodation (i.e., private, one person office space).

Based on an assessment of relevant submitted information, including an initial intake interview, the Commission is unable to conclude that a violation of Federal law on the part of Respondent occurred. This does not certify Respondent complies with applicable anti-discrimination statutes; no finding is made as to any other issue that might be construed as having been raised by this charge.

Therefore, the complaint is hereby dismissed in its entirety. Attached is "Dismissal and Notice of Rights," affording an opportunity for a private lawsuit. If you wish to pursue matter further in Federal District court, the lawsuit must be filed within 90 days of Notice's receipt.

In the interim, should questions arise regarding the aforesaid, kindly feel free to contact Investigator Ashraf Ahmed directly via telephone, (212) 336 – 3781.

Sincerely,

on behalf of

Kevin Berry
District Director

Date 12/30/2017

# INTRODUCTION

This is an action to remedy violations of the rights of Plaintiff, Nicholas Elgar, under the Americans with Disabilities Act of 1990, as codified, 42 U.S.C. 12112 to 12117. On Friday 02 December 2016, my employment at Seafield Out Patient, Riverhead, NY, owned and operated by Seafield Services Inc., was terminated, after multiple refusals to grant my requests for a "Reasonable Accommodation," were denied; throughout my employment I was also subjected to various acts of Retaliation - which continue in the present - the combination of which, resulted in my firing.

During this time, apart from Discrimination, Ms Doris, also engaged in various other acts, including, but not limited to: Retaliation, including "material adverse employment action;" Negligence: related to Supervision, and Training. Harassment, based on my Disability; "Setting Me Up To Fail;" False Claims; and Prima FacieTort, including "intentional infliction of emotional distress."

Both Seafield Center Inc.; Seafield Services, Inc.; and Ms Doris, also engaged in Breach of Contract; Tortious Interference and creating a Hostile Workplace.

Seafield Center Inc.; and Seafield Services Inc.; also engaged in violations of the Equal Pay Act and other Labor Laws, regarding Wage & Hour issues; deprived my Spouse & I of Benefits, including Health & Dental Insurance; Retaliation; Negligent Supervision; Fraudulent Misrepresentation and Age Discrimination.

# STATEMENT OF FACTS

## A. Decision to change Careers

1. In 2014, at 56 years of age, I decided to change careers, and decided to become a New York State, Office of Alcohol Substance Abuse Services (OASAS), Certified Alcohol & Substance Abuse Counselor – Trainee (CASAC-T). To become a CASAC-T, the only requirements I had to fulfill are to be 18 years of age or older, have a High School Diploma or GED, and to complete 350 hours of classroom tuition. I enrolled in a program, which cost approximately $4000.00, and received my Certificate of Completion, in May 2015. To receive a certificate confirming completion of the 350 hours, I simply had to be present in the classroom; there were no assignments, tests or exams to pass, simply being physically present in the classroom is all that is required, to be issued a Trainee Certificate. No tuition is provided on Electronic Medical Record keeping, as each employer is presumed to train their employees on their own proprietary systems. CASAC Trainees are required to complete 6000 supervised hours of work (approximately 3 years Full Time) – a minimum of 3000 of those hours must be completed at an OASAS licensed facility – have three licensed professionals complete and sign a document attesting to the candidate's competency and ethical conduct, and also pass a three hour exam. All of these requirements must be completed to move from Trainee status, to fully licensed CASAC. These requirements do not have to be completed immediately, though they must be accomplished within a five year period, with an available extension of three years, if more time is needed. Therefore, a person can remain in trainee status, with no practical work experience, or knowledge of Electronic Medical Record keeping, for up to eight years, having done nothing more than be physically present in a classroom, for 350 hours. Given that is the case, it is self evident that a Trainee will require extensive training and supervision. Therefore, to maintain compliance, and insure the well being of clients, among many other requirements, OASAS requires that CASAC Trainees receive "Minimum Regular Supervision, of weekly one-on one 'Clinical' Supervision;" and various additional, "Intensive Supervision," as detailed in Exhibit A. I relied on this being provided by Seafield, but it was not.

2. As OASAS licensed facilities, Seafield's In and Out Patient facilities are subject, not only to OASAS regulations, but also to Clinical and Administrative Systems, Guidelines and Protocols, as defined by the Substance Abuse and Mental Health Services Administration (SAMHSA). Plus Federal and State laws. In addition to the rules in Seafield's own Employee Handbook, employees are also subject to the ethics and rules of their own individual licenses. In my

Supervisor, Lynn Doris's case, as an LCSW licensed by the Office of Professions, and as a CASAC licensed by OASAS, both New York State agencies. I had a reasonable expectation that Seafield would be in compliance with all of the above. If I had known I was going to experience significant deficiencies and omissions in all of these areas, I would not have accepted a position at Seafield Out Patient in Riverhead, NY.

## B. Reason for filing this Amended Complaint

1. I filed this Complaint to address Discrimination against me, based on my known Disability, of Attention Deficit Disorder (ADD) and Attention Deficit Hyperactive Disorder (ADHD), by Lynn Doris, MBA, LCSW, CASAC, the Executive Director, of Seafield Out Patient, Riverhead, NY, specifically, for refusal to grant my request for a "Reasonable Accommodation." I was employed at Seafield Out Patient, Riverhead, NY for approximately seven and a half months – thirty three weeks, to be exact – from Monday 18 April thru Friday 02 December, 2016.

2. Ms Doris, used her position, power and authority, as Executive Director, to make Administrative decisions that negatively impacted me, including refusing to grant my request for a "Reasonable Accommodation," to be relocated to an office, where, following Seafield's customary work procedures I would have been assigned, as a normal matter of course. Ms Doris deliberately kept that office vacant for more than half the time I worked at Seafield Riverhead. The office remained empty for approximately seventeen weeks, from late May thru mid September 2016. By deliberately keeping the office empty, Ms Doris deviated from Seafield's customary practice of assigning Case Managers to the work station in the room where they facilitated their Group Therapy assignments.

3. Ms Doris, also used personal medical details I revealed to her in confidence, in combination with her expert knowledge as an experienced, skilled and licensed expert in both the symptoms and diagnosis of ADD/ADHD, to retaliate against me by deliberately creating a negative environment customized to exacerbate the symptoms of my known disability, while simultaneously criticizing me for manifesting those symptoms, which inevitably emerged under the deliberate conditions of stress and duress she had created. Throughout, she repeatedly denied all requests for "Reasonable Accomodation," or any relief from the obstacles she had set to retaliate against and undermine me.

4. In Mid August 2016, after requesting a "Reasonable Accomodation," on several occasions, Ms Doris forbade me from bringing up the subject of any "Reasonable Accommodation," ever again. She stated it was, "a closed matter, and I don't want to hear about it any more." As a result, I asked Salvatore Sexton, Senior Counselor, who was later assigned to be my Supervisor in late September 2016, to intercede on my behalf. His requests for any kind of "Reasonable Accommodation," were continuously and repeatedly rejected by Ms Doris, who continued her retaliations against me.

5. The documents Ms Doris prepared as the basis of my firing, list all the symptoms, detailed in the DSM-5, which would form the basis of a Clinical Diagnosis of ADD/ADHD. As an LCSW, Ms Doris is licensed by the State of New York, to provide a formal diagnosis of ADD/ADHD. Ms Doris refused every accommodation I requested to accommodate my ADD, then listed the Clinical Symptoms of ADD/ADHD, as the justification for firing me.

# FIRST CAUSE OF ACTION
## (Discrimination on the basis of my known disability)

1. After being fingerprinted, and passing a background check through the Justice Center, I was originally hired by Seafield Center Inc., an OASAS licensed, one hundred bed Inpatient Alcohol and Drug Rehabilitation facility in Westhampton Beach, NY, on Wednesday 02 December 2015, by Craig Schaefer, CASAC, to work as a Counselor, part time, two evenings during the week, and from 2.00pm to 10.00pm on Saturdays. At that time I disclosed that I have a diagnosis of Attention Deficit Disorder (A.D.D.), and am taking prescription medication to control it. On December 2015, I was instructed to take my prescription medication container with me, when I went to submit a Urine sample for Toxicology testing at the Nurses Station, located within Seafield Center, and to show the prescription label and medication to the Nurse supervising the test, which I did. This was all recorded in my employee medical file. I did not require, nor did I request any accommodation for my A.D.D. at Seafield Center in Westhampton, as I was assigned to complete my work in a private office, without interruptions, in the clinical wing, which was secluded and quiet during evening hours and on weekends. I have been employed part time as a Counselor at Seafield Center, continuously since my hiring, more than two and half years ago, and continue to work there now.

2. Mr Schaefer, interviewed me for the part time position, at Seafield Center, on Wednesday 11th November 2015. During the interview, Mr Schaeffer, requested my CASAC-T License number, and accessed my record on the OASAS Website.

He observed that I had not completed any of the licensing requirements – detailed under, "Statement of Facts," A. Decision To Change Careers, paragraph 1, above - apart from the 350 hour classroom training. I recall Mr Schaefer, stating to me that Seafield, is aware that as a trainee I, and others before me, have little experience in this area of work. He stated, "We know you don't know anything, and we don't expect you to know." He added that, Seafield, therefore, makes sure that trainees receive all the necessary training to be able to do their assigned work. Mr Schaefer stated, "I don't want you doing anything, until you are sure you know how to do it properly." Within two weeks of being hired, Mr Schaefer scheduled an in house training on the Electronic Medical Record keeping system, called, "Avatar," with Ginger Dammann, Seafield's Head of Technology, in Seafield's "Computer Lab," in a Basement area, at Seafield Center, in Westhampton. The training I received was specific to the work I would be doing at Seafield Center, the In Patient facility. I received no such comparable training while I was employed in a Full Time position at Seafield Riverhead.

3. Mr Schaefer, informed me that Seafield was requesting that I schedule, and pass, the CASAC exam, "as soon as possible," as I was an older person – age 57 at that time – making a career change, later in life, with no experience, other than part time work as an unpaid intern, for approximately four months, from July 2015 thru the date of my hiring December 02, 2015. I informed Mr Schaefer that I had already scheduled to take the CASAC Exam, on Thursday 17 December, 2015. I passed the test, and provided Seafield with official documentation confirming that fact. Mr Schaefer, told me, "You are the only CASAC Trainee I know who has passed the test." Mr Schaefer, documented all of this in a hand written supervision note.

4. To my knowledge, it is not a prerequisite for other Trainees, including those hired to work as Case Managers, Full Time, to take, and pass, the CASAC Exam. Nevertheless, I was required to do this as a part time employee, based on my age and inexperience. The CASAC exam is a proctored, demanding, three hour exam, that requires payment of a fee of $245.00, which is almost half a week's 'Net' wages, for the average CASAC-T, working Full Time, for $16.00 per hour, at Seafield.

5. I told Mr Schaefer, that once I had accumulated sufficient experience, I would like to be considered for a Full Time position as a Case Manager, at Seafield Center, in Westhampton. In March 2016, I received my 90 day review, as mandated, and described in Seafield's Employee Handbook, in my Part Time position, which was very positive. I never received a 90 day review at Seafield Riverhead, where I worked Full Time.

6. In the Fall of 2016, I informed Mr Schaeffer, that now I was working in a Full Time position, I had the necessary income to pursue a Master's Degree Online. I applied to various schools, and asked Mr Schaefer to write a letter of recommendation for me, which he agreed to do. I was accepted at the University of Aspen, a school approved by OASAS, to enroll in a Master's Degree Program in Psychology and Addiction. The payment structure was manageable, as it was a "pay as you go" plan, paying a flat fee once per month. However, due to the termination of my employment in Seafield Riverhead, I did not enroll, due to the loss in my income. If I had enrolled, at this point I would be close to completion, and since I have sufficient work experience hours, which combined with the hours a completed Master's Degree would be equivalent to, I would be within months of becoming an Advanced CASAC, due to my education, plus I would be on track to become a Master Counselor, within three years. My employment termination, ended that. I turn sixty years of age on 02 October 2018, so this is a very significant loss of time for me, in the pursuit of a new career. It also runs directly counter to what both OASAS and SAMHSA state, that Supervisor's working in facilities licensed by those two agencies go out of their way to retain counselors, and focus on reducing drop out and turn over in this area of work, as it is well known to be difficult to keep employees, and the nature of the work is so important to the needs of society.

7. A Full Time Case Manager, position at Seafield Services Inc., Out Patient Alcohol and Substance Use facility in Riverhead, NY, became available, and I applied for the position, after discussing it with Mr Schaefer. I told him that if I was hired to work in Riverhead, I only intended to work there until a position for which I was qualified became available in Westhampton, as it was my preference to work In Patient, rather than Out Patient. During my job interview with Lynn Doris, Executive Director; and Cynthia Milani, Clinical Director, on Wednesday 23 March 2016, I was told that they needed to hire someone relatively quickly, as various employees were scheduled for vacation, they also alluded to other reasons, but did not specify what those were at that time. They stated that as I was already a Seafield employee, they would not have to wait for finger printing, criminal and other background checks to be completed, as required by OASAS. In addition all my medical and other paperwork was complete and up to date, and I was already on the payroll. I was asked if I would be comfortable, not only facilitating Group Therapy for my own assigned clients, but also to "cover" groups for others who would be taking vacation. I agreed to this.

8. I was also asked if I needed any particular training. I stated that I needed training on various aspects of the EMR (Electronic Medical Record) system, "Avatar," particularly regarding, "Treatment Plans," and "Discharges." Referring to my Resume, I stated that I had worked, part time, as an unpaid intern,

Samaritan Village Out Patient in Harlem, for seven months, from mid July 2015 and my last day there would be April 08, 2016. I informed them that most of my record keeping experience had been on paper, as the law requiring treatment facilities to switch over from paper to EMR keeping, had not become mandatory until October 01, 2015, which was the date Samaritan Village switched over. So I was therefore somewhat inexperienced in OASAS Out Patient EMR keeping.

9. My first day of work was, Monday 18 April, 2016. I quickly began covering other Counselor's Groups, but I did not receive any training on "Avatar." Instead, Ms Doris, instructed me to ask my co-workers to show me, if there was anything I did not know how to do. Although some attempted to provide assistance, their work loads were such that they did not have time. It was not until five months later, in late September 2016, when Salvatore Sexton was assigned to be my Supervisor, that he began training me. In his Supervision note, dated, 11/22/16, he records that I now had a working knowledge  'Treatment Plans,' and 'Discharges,' in the EMR.

10. The Seafield Riverhead location consists of two buildings, the Main Office, located at 212 West Main Street, and a separate, smaller office, approximately 35 yards down the street, to the West, at 230 West Main Street, Riverhead. At that time I facilitated my daily Group Assignment, from 11.15am to 12.15pm, in the smaller building at 230 Main Street, Riverhead. The only other Case Manager who conducted a Group in that room, at that time was, Salvatore (Sal) Sexton, whose Group was from 8.00am to 9.00am. Sal, was assigned the one and only work station in that room.

11. Even though I facilitated my Group in the smaller building, the work station I was assigned to was located, in the Main Building. I shared this office with two co-workers: Mary Dankievich, an "Evening" Counselor, and Erin McGrath, a "Daytime" Assessment Counselor. This is the smallest multi person office in the Riverhead location. Located within this office is one of the main supply closets used by all the Riverhead staff, who come in and out of that office at all times. Located directly outside that office is another supply closet, that houses the medical safety "Drop Boxes" where Counselors would place Urine Specimens collected from clients to be sent out to testing Laboratories. In addition, other supplies, including documents necessary to complete Assessments, Intakes and other procedures were stored in that closet. As a result, the office was very chaotic, with multiple distractions, including significant "traffic" of both Seafield clients and staff, constantly coming and going, in an out of that office. During my first week there, Christopher Ronan, CASAC-T, one of my co-workers, who I also worked with in Westhampton, came into the office. I asked him if he had any advice for me in my new job in Westhampton, he replied, "Yes, get out of this office as quickly as you can, I was in here for a while, it's almost impossible to get any work done, it's like 'Times Square,' people just walk in and out of here all

day long." Mary Dankievich, CASAC-T, one of my new office mates immediately agreed, stating, "I want to get out of here as soon as I can too. There's an unstable Internet connection in here. I get kicked off, "Avatar," all the time, lose my work, and have to do it all over again, it's really difficult." Ms Doris, has been the Executive Director of Seafield Riverhead for approximately ten years, and is therefore very familiar with all aspects of the working environment in both buildings.

12. My desk was located directly next to the door, which was almost always left open, as the office became too stuffy if the door was closed. My chair was, approximately six feet away from the afore mentioned closet that housed the two Urine Specimen "Drop Boxes." Almost immediately, it became obvious to me that the office I had been assigned to was having a severely negative effect on my ability to complete my work in an efficient and timely manner.

13. One of the counselors assigned to the office was tasked with conducting "Assessments" for potential clients entering treatment. This process involved interviewing each individual client for up to ninety minutes. On occasion, clients could become quite emotional, in describing their life experiences that had culminated in their seeking treatment. On occasion, clients were accompanied by a parent. My scheduled hours were from 8.00am to 4.30pm, Monday thru Friday. Erin McGrath, the Counselor conducting "Assessments," was scheduled to work, almost exactly the same hours as me, which meant there was almost always a client sitting directly next to me, talking to Ms McGrath. I was the only Case Manager, in the Riverhead Location, who shared an office with an "Assessment" Counselor with an identical, overlapping, schedule. Every other "Assessment" Counselor either worked in an office alone, or shared an office with a Counselor who worked a different schedule, for example the afternoon/evening shift, from 12.30pm to 9.00pm, so that during at least half the daily shift, no "Assessments" were being conducted.

14. Part of Ms McGrath's responsibilities as an Assessment Counselor, were to get authorization from Medicaid and other Health Insurance providers, for clients, as a pre-requisite for them being admitted to Seafield. Ms McGrath, mostly left voicemails, as it was almost impossible to get an Agent to answer their phone directly. Ms McGrath, frequently requested I answer her phone, if she had to step out of the office for any reason, to insure that she did not miss the call, which would put the client's admission that day, at risk.

15. At some point in approximately August 2016, Clinical Supervisor, Patricia Klein, LMSW, came into the office to speak to Ms McGrath. Observing Ms McGrath talking with a client, she left the office, but not before asking me to hang up the phone call I was on, so as to be able to accompany her to her office. Ms Klein informed me that I could not be on the phone, discussing any matters

pertaining to a client, if another client was in the room, even if I was not using the client's name. I had been speaking with Parole Officer Joe Rehal, who was notoriously difficult to reach, and always had a full voicemail, so leaving a message was rarely an option. Mr Rehal, had been a topic of discussion at one of the weekly staff meetings, as most Case Managers had difficulty connecting with him, and he was the local Parole Officer who had the largest number of Seafield Riverhead clients on his case load. I told Ms Klein, that, more often than not, there was a client in the office, during my shift, as "Assessments" were Ms McGrath's job. Ms Klein, instructed me that, nevertheless, I should either transfer the call to another office, or ask to call back at another time.

16. As a Case Manager, one of my responsibilities was to conduct regular individual sessions with clients on my case load. "Best Practices," describe the "Therapeutic Alliance," which is the one on one connection between a Counselor and a client, as being one of the most important elements of treatment, which, statistically, results in the most successful outcomes for clients.


17. At some point in August 2016, Mark Epley, CEO of Seafield, attended a staff meeting, during which he was asked by Karen Mayer, CASAC-T, if there were going to be any pay increases, in the near future. Mr Epley, stated, that in order to do that, Seafield would have to increase its productivity by 20%. Mr Epley, stated that if every employee who scheduled their own "Billable" work items, would increase their work load by 20%, he indicated that he would be able to consider pay increases. Mr Epley, then encouraged those employees who were in a position in increase their "Billable" items, to do so, both for their own benefit, and to be supportive of their co-workers, who were not in a position to do that. I immediately began scheduling more Individual Sessions with clients, as instructed, either for 45 Minutes or 25 Minutes, as those are the two "Billable" items allowed, that I was able to schedule myself. I was voluntarily scheduling, at least one, and often two, individual sessions per day. As I was assigned to a cramped three person office, my individual sessions, were rarely one on one, as more often than not, my client was engaging not just with me, but with my two office mates as well, as the office was so small, that we were all, essentially, sitting side by side. I described this situation to Ms Klein, and asked her if it was permissible for me to conduct these individual sessions in this manner, with three counselors and one client, instead of being one on one, so long as I first received the permission of the client and my two co-workers. Ms Klein, confirmed that was an acceptable practice, though, obviously less than ideal. Throughout this time, the office I facilitated my daily Group in, which I had repeatedly requested to move to, as a, "Reasonable Accommodation," remained vacant. I would have been able to conduct Individual sessions, one on one, in an appropriate, "Best

Practices," manner if had been allowed to relocate to that office. Ms Doris, consistently refused my requests.

18. For most of the first month I worked at Seafield Riverhead, from 18 April 2016, thru late May 2016, Ms Doris was absent from the office. I was told her mother was ill, and was not expected to recover. To the best of my knowledge, at some point in May 2016 Ms Doris's mother passed away.

In late May 2016, it was announced at the weekly staff meeting, that Cynthia Milani, Clinical Director, would be going on "Military Leave," from approximately Memorial Day 2016, thru Labor Day 2016, as her daughter, who is in the Military had been stationed to Germany and was leaving her children behind in the USA. As Summer Recess from schools was soon to begin, Ms Milani, the children's Grandmother, was taking a leave, until the children returned to school in Fall 2016.

After Ms Milani went on leave, Ms Doris was absent from the office again, as she had another family matter to attend to. Again, to the best of my knowledge, based on information provided to employees, Ms Doris' mother-in-law, had health issues, and also passed away, at some point in June 2016.


With the Clinical Director, Cynthia Milani, on leave, Salvatore Sexton, was soon promoted to Senior Counselor. He relocated from the Group Room in the smaller building, to an office in the Main Building. His work station in the smaller building was now vacant.

19. At some point in June 2016, one of my two office mates, Mary Dankievich, a CASAC-T, who conducted her daily Group in "Room 5" – the largest Group room in the main building - requested to move to a vacant work station in the office immediately next door to our office. Ms Dankievich, requested to move, in part, because our office was known to be difficult to work in, due to constant interruptions, and an unstable internet connection, that would frequently "crash," causing large amounts of work to be "lost." Ms. Dankievich, who was not requesting any special accommodation, due to a disability, was immediately granted her request, and moved to the adjacent office. Ms Doris stated that the reason Ms Dankievich requested to move was directly due to my talking too much and distracting her so much that she could not complete her work. Ms Dankievich, worked the afternoon/evening shift, so was only in the office at the same time as me for approximately three hours. If my talking had contributed to Ms Dankievich's desire to move, it was not the primary reason she moved, as she had expressed concerns about the difficulty working in that office during the

first week I worked there, at which time my "talking," would not have been an issue.

20. Around this same time, in June 2016, my other office mate, Erin McGrath, was also granted a request to move to a one person office, in her case, to the smaller building. However, it took Ms McGrath close to two months to be able to move, as her phone extension could not be moved to that location, until a back ordered part arrived, and could be installed. Again, to the best of my knowledge, Ms McGrath, was not requesting any special accommodation, due to a disability.

21. At some point in June 2016, Ms Doris, personally informed me that Ms Dankievich had only requested to change offices because, she stated, "You talk too much, and it's distracting to other people, and makes it harder for them to get their work done." I apologized, and stated to Ms Doris, "I assume you already know that I have ADD." Ms Doris, replied that she did not know that. I told her that my ADD is recorded in my employee file, which I assumed she had reviewed. Ms Doris, told me she had not seen my employee file, because I was originally hired in Westhampton, and she would have had to make a special request to HR to have my file sent over to Riverhead, which she had not done. I requested that she verify my file to confirm that I have ADD. I requested to move to the vacant work station in the smaller building, as it would both help me do my work more effectively, without distractions, and would benefit my office mates, who would no longer be subjected to what Ms Doris described as my, "excessive talking." Ms Doris, denied my request, stating that, "all work station assignments at Seafield are based on Seniority, and, in addition, there will be no office reassignments, until Cindi (referring to Clinical Director, Cynthia Milani) returns from leave, after Labor Day." These were demonstrably false statements, which set the tone of mistrust in my relationship with Ms Doris, thru the remainder of the time I was employed at Seafield Riverhead, as both my two office mates had been approved to relocate, after Ms Milani, had gone on leave, and in neither case was approval given based on Seniority, or a request for a, "Reasonable Accommodation." In fact there appeared to be no "Seniority System" of any type at Seafield relating to work station assignments, among CASAC Trainees.

22. At this time, in June 2016, I, again, requested help with "Treatment Plans," and "Discharges." Although, I had completed both in the past, mostly on paper, my experience was limited, and I was unfamiliar with the mechanics of the EMR keeping system, "Avatar," for these two specific forms. I did not receive any assistance with this until late September 2016, after I had been working at Seafield Riverhead, for approximately five months.

23. On August 01, 2016, Teresa Boeklin (nee Duffy) – an LCSW with a Connecticut license - began working at Seafield Riverhead, on the afternoon shift, from 12.30pm to 9.00pm. She was assigned to the desk next to me. On August 04, after only three afternoons working together, I was told by Ms Doris, that Ms Duffy had made a formal complaint against me, for "talking too much," which distracted her from her work. I again stated that "excessive talking," is one of the symptoms of ADD, and again requested to move to the work station in the Group room, in the smaller building, which continued to remain vacant. I was told I had already been given an answer to that request, and I was refused a "Reasonable Accommodation," again. Again, Ms Doris, reiterated that work station assignments were based on Seniority.

24. I considered Ms Doris's assertion that Ms Boeklin had made a formal complaint about my "excessive talking," as unlikely, as Ms Boeklin appeared to have Tourette's Syndrome. In addition to making the various sounds listed in the DSM 5 – throat clearing, grunting, sniffing, snorting, humming and singing – Ms Boeklin, spoke in a clear conversational tone of voice, detailing the tasks she had to perform during her shift. Frequently, she would ask a question, believing she was speaking to me, I would answer. She would most often reply, "I'm not talking to you," even at those times when I was the only other person in the office. We subsequently had a conversation, during which she agreed that if any of her questions were directed to me, she would say my name, so that I knew she was looking for a response, specifically, from me. If she did not say my name, I was to ignore any questions. I did not report this, firstly, as I no longer trusted Ms Doris, but also, because I was scheduled to take some vacation days off at the end of August 2016, and decided to wait to see the results of the Ms Doris' office reassignments, after Labor Day, as either one of us could potentially be assigned to different offices, which turned out to be the case. Ms Boeklin, was assigned to a different office, though it appeared unlikely that she was moved due to my "excessive talking," as she talked more than I supposedly did.

25. I later discussed this matter with Mr Sexton, when he became my Supervisor, and he confirmed to me that he knew exactly what I was talking about, as he had sat at my desk, directly next to Ms Boeklin, for several days, during the last week of August, when I was on vacation. In addition, Ms McGrath, who shared an office with Ms Boeklin, after she moved out the office she shared with me, confirmed an almost identical experience. Ms Boeklin, subsequently applied for a Part Time Evening/Weekend Position at Seafield Riverhead, in the Fall of 2017, where Ms McGrath, CASAC, is now a Supervisor. Based on her own personal experience with Ms Boeklin, and choosing to confirm her beliefs by mentioning the topic to both myself and Christopher Ronan, CASAC, she recommended that Ms Boeklin not be hired. Ms Doris, who as an LCSW, is the only professional amongst the four of us, licensed to diagnose. In her response to my EEOC filing,

she claimed that Ms Boeklin's behavior was, "not evident." This seems unlikely, as Ms Boeklin's behaviors were obvious to all four of us who are CASAC's and CASAC-T's, licensed only to make, "Assessments;" whereas Ms Doris, as an LCSW, is licensed to make a formal diagnosis. I seems highly unusual for her not to have made the same observations as we all did.

25. In mid August, Ms Doris, requested to meet with me, because a blank CVS Child Proof Medication Container had been found on my desk, with one pill in it. She informed me that she had been able to identify the pill, and confirmed that it was for ADD, and that I had previously listed it on my medical form at the time I was first hired on December 02, 2015. This precipitated a more detailed conversation about my ADD, including questions about the medication, if it helped me and how. I stated that it was helpful, however, I continued to have difficulty with Time Management, and Organizational issues, especially if I become distracted or interrupted. I remember stating that, "Once I get, knocked off task, it can take me a while to get back on track." Ms Milani documented in her Supervision note dated, 10/11/2016, that I had Time Management and Organizational issues. During my supervision sessions with Mr Schaeffer at Seafield Westhampton, he made a similar observation, however, he went to record that I had improved greatly, and it was no longer an issue. In Westhampton I completed my work in a quiet one person office, with minimal interruptions and distractions, which was exactly the "Reasonable Accommodation," I repeatedly requested of Ms Doris.

26. During this same meeting, I shared that I would need to schedule specific "sick" days, as I have Cancer, which was first diagnosed in 2014, for which I have regular treatment. I mentioned that I had recently had one of my regularly scheduled Biopsies a couple of weeks earlier, in early August 2016. In conversation with Ms Doris, I shared that I'm doing well, however, the Specialist treating me, emphasizes that I should try to keep stress to the barest minimum, and do everything to reduce stress, wherever it might occur. At the end of our conversation, I again requested to move to the vacant work station in the Group room, where I facilitated my daily Group. It was at the end of this meeting that Ms Doris clearly stated to me that she did not want me to make this request for a "Reasonable Accommodation," any more. She stated It was now, "a closed issue," and again reiterated that, "all Seafield work station assignments are based strictly on Seniority." Again, this was a demonstrably false statement, as James O'Brien, CASAC, who had been Clinical Director of Seafield's In Patient Rehab in Westhampton for more than twenty years, had been reassigned to a three person, windowless, interior office, with two other senior supervisors, when he took "semi retirement," and returned to working as a case manager.

27. At some point in Mid August 2016, Christopher Ronan, CASAC-T, came into the office I shared with Ms McGrath, who was also present. He was upset, as he had just found out that, Timothy Griffin, CASAC-T, who he shared an office with, "has decided that he should have the Group Room next door." Referring to the vacant work station in the smaller building. In addition to myself and Mr Sexton, Mr Ronan, had begun to facilitate his Group in the smaller building at some point in early Summer 2016. Mr Ronan, had previously worked as a Therapy Aid at Seafield Westhampton, and, at that time, was working Full Time as a Case Manager at Seafield Riverhead, and working Overtime at Seafield Westhampton two evenings per week, plus working as a Counselor for the Family Program on Sundays. Nevertheless, Mr Griffin, who worked only as a Counselor Full Time at Seafield Riverhead, and nowhere else, had met with Ms Doris to, make a case for himself that because of his own self perceived sense of seniority, he should be moved to the work station in the smaller building. In addition, Mr Griffin, let it be known that he only wanted to supervise urine collection for toxicology testing for his own assigned clients, and did not want to be asked to supervise any other urine collections. Mr Ronan, was upset, and stated that he felt disrespected, because Ms Doris had apparently agreed with Mr Griffin's self aggrandizing statements of seniority, and to all his other demands.

28. At some point in late August or early September 2016, before Mr Griffin was scheduled to move to the vacant work station in the smaller building, I met with Senior Counselor, Sal Sexton, who was assigned to be my Supervisor. I stated to him, "I am not in the habit of sharing my diagnosis, however, I have ADD, and I need your help, because I'm behind in my paperwork, and I'm afraid I am not going to make it, if I stay in my office, it's too distracting for me." I informed Mr Sexton, that I had requested to move several times, and had been told, by Ms Doris, "no," every time. I stated that I had also been forbidden to bring up the matter ever again, as it was a, "closed issue." I asked Mr Sexton to please intercede with Ms Doris on my behalf. We then had a detailed conversation, during which I pointed out to him that Mr Griffin would have very limited use of the work station in that Group room. Mr Griffin's shift was from 7.30am to 4.00pm. As an IOS Counselor his assigned Group took place from 9.15am to 12.15pm. Mr Sexton's Group was from 8.00am to 9.00am, followed by Mr Ronan's Group from 9.00am to 10.00am, followed by my Group 11.15am to 12.15pm. Taking into account, a mandatory one hour break for lunch – which Seafield requests employees take outside of their office, specifically requesting that employees not stay at their desks during that hour - Mr Griffin, had access to that room for approximately two and a half hours per day, except for Thursdays, when it dropped down to ninety minutes, as all staff had to attend the weekly staff meeting from 3.00pm to 4.00pm. In contrast, my shift was from 8.00am to 4.30pm. I would have had use of that Group room from 10.00am, when Mr Ronan's Group finished, straight through to the end of my shift at 4.30pm. In

addition, as an IOS Counselor, Mr Griffin was not required to schedule individual sessions with clients. My responsibilities included Individual Sessions, which CEO Mark Epley had specifically requested us to increase by 20%. I was not able to conduct my Individual sessions one on one, as my two office mates were usually present, so my clients were meeting with three counselors not one. Nevertheless, Ms Doris assigned Mr Griffin to that work station, which was a significant break from Seafield's customary practices.

29. Seafield Westhampton is comprised of two separate buildings, as is Seafield Riverhead. When the second building opened in Westhampton, approximately August 2016, many employees, some very senior, who had been with the company for more than twenty years, requested to be relocated to the second building. Seafield's policy was simply stated, only those employees who performed their assigned work function in that building were assigned to that building. When I first began working at Seafield Riverhead, the same rule applied. Every employee in the smaller building in Riverhead performed their assigned work in that building. Mr Griffin, facilitated his Group in "Room 5," in the main building. Every counselor who facilitated their Group in "Room 5," was assigned to a work station in the main building, many with significant seniority to Mr Griffin. Mr Griffin, was the only Case Manager whose Group took place in "Room 5," in the main building, who was assigned a work station in the smaller building. In addition, he was the only employee assigned to the smaller building who did not perform his work function in that building.

30. To date, Seafield has provided three separate and distinct answers as to why my request for a "Reasonable Accommodation," was repeatedly denied. Firstly, Ms Doris's stated reason for denying my request, was, that "all Seafield work station assignments are based strictly on Seniority." Ms Doris, gave this as the sole and only reason, every time I made my request, without exception.

31. Secondly, in approximately June 2017, Seafield's Attorney, Kathryn Barry, told my lawyer, at that time, that my request for a "Reasonable Accommodation," had been denied, because, "Mr Elgar, did not specifically state at the time of his request, that by moving to the requested office work station, the quality of his work would improve." She claimed that Ms Doris denied the request because I had not made that assertion.

32. The third reason was given in response to my EEOC filing, which stated, "His request was denied, inter alia, because Mr Elgar required more supervision and monitoring than any counselors at Seafield in Riverhead at that time." This reason is demonstrably false, as not only did I not receive my 90 day supervisory

review, I received approximately two documented supervision meetings in the five months between my hiring on 18 April 2016 and mid September 2016, which Seafield is obviously fully aware of, as it is possession of all my documented supervision meetings.

There is a fourth reason for the denial of my request for a "Reasonable Accommodation," which follows.

33. The following paragraphs detail a fourth, and the most likely, and authentically truthful, reason that my request for a "Reasonable Accommodation," was denied. Specifically, as it concerns the individual who Ms Doris, chose to assign to the work station in the smaller building.

At some point in Mid August, Christopher Ronan, CASAC-T, came into my office, while Ms McGrath was also present. He was upset, as he had just found out that, Timothy Griffin, CASAC-T, who he shared an office with, "has decided that he should have the Group Room next door." Referring to the vacant work station in the smaller building. In addition to myself and Mr Sexton, Mr Ronan, had begun to facilitate his Group in the smaller building at some point in early Summer 2016. Mr Ronan, had previously worked as a Therapy Aid at Seafield Westhampton, and, at that time, was working Full Time as a Case Manager at Seafield Riverhead, and working Overtime two evenings per week, plus working as a Counselor for the Family Program on Sundays, both at Seafield Westhampton. Nevertheless, Mr Griffin, who worked only as a Counselor Full Time at Seafield Riverhead, and nowhere else, had met with Ms Doris to, make a case for himself that because of his own self perceived sense of seniority, he should be moved to the work station in the smaller building. In addition, Mr Griffin, let it be known that he only wanted to supervise urine collection for toxicology testing for his own assigned clients, and did not want to be asked to supervise any other urine collections. Mr Ronan, was upset, and stated that he felt disrespected, because Ms Doris had apparently agreed with Mr Griffin's self aggrandizing statements of seniority, and to all his other demands.

34. It is not unusual for Counselors and Case Managers to be persons, "In Recovery," themselves, and Mr Griffin, identified himself as being in that category. At that time, Mr Griffin, appeared to be manifesting the well known and documented behaviors of what Mr Ronan described as that of a, "Classic Dry Drunk." Mr Griffin, openly complained about Seafield. During my first week of employment in Riverhead, he asked me if I was close to reaching the 3000 hours of work experience at an OASAS facility, necessary to fulfill licensing requirements. He stated that he was close, and as soon as he reached 3000

hours he was quitting, but not until he had used all his vacation days to go to Hawaii in December 2016. To my personal knowledge, he stated to myself, Ms McGrath, Mr Ronan, Mr Sexton and Ms Klein, "I hate my job, I hate Seafield, Seafield sucks," often followed with, "Seafield only cares about money, they don't care about the clients at all."

35. In late October 2017, a client came into the Supervisor's office in Seafield Westhampton, during my shift there, Ms McGrath, now a Supervisor, in Westhampton was also present. Upon learning that both of us had previously worked in Riverhead, the client asked if we knew Mr Griffin. The client then stated that Mr Griffin would regularly begin his Group Therapy sessions by stating directly to clients, "I hate my job, I hate Seafield, Seafield sucks, but I like you guys." After the client left the office, we were both quite shocked, but not surprised, as the words and phrases used by the client were identical to those we had heard ourselves, both individually, and together, as we had shared an office for several months, and Mr Griffin had made those statements in the presence of both of us. Ms McGrath, stated, "I can't believe they didn't fire him.

36. Ms McGrath stated, that Mr Griffin did not quit after his Hawaiian vacation, as he injured his back and was out on disability for three months in early 2017, before he decided to return to work. Ms McGrath, added, that Ms Doris gave Mr Griffin a $1.00 an hour pay increase from $16.00 to $17.00, which based on a 37.5 hour a week schedule, is an increase of approximately $2000.00 per year. This made Mr Griffin a higher paid CASAC Trainee, than everybody else, which Ms McGrath, stated upset many of his co-workers, especially, women, who continued to be paid less.

37. Clients usually attended Mr Griffin's IOS Group, for approximately 6 weeks, before being, reassigned to a one hour daily Group. Many of these clients were assigned to my, and Mr Ronan's caseload. On occasion we discussed the fact many of these clients shared that Mr Griffin was known as, "Wrong way Tim," on account of the fact that he discussed his experience, under the influence of Alcohol, driving the "wrong way," down the William Floyd Parkway, in Suffolk County, NY, prior to being arrested. Mr Griffin, expressed his frustration that he did not have a Drivers License, but was hoping that it would finally be restored to

him in January 2017. He often expressed that as soon as he reached 3000 OASAS work hours, and got his Driver license back, he would be quitting Seafield, as fast as he could.

38. Perhaps an argument could be made that, under the rules of his CASAC-T license, Mr Griffin should have recused himself from facilitating his assigned Group, and from his caseload, and sought help from Seafield's Employment Assistance Program (EAP). Notwithstanding that, what Mr Griffin's personal challenges also illustrate is that Seafield acts with great leniency, and understanding, and allows an individual who encounters difficulties in their work, to be granted every request they make, and to be given as much space as they require to rehabilitate themselves, without interference or any disciplinary action. Mr Griffin, was given the office he asked for, allowed to, essentially, only supervise Urine collection for toxicology testing from his own clients, and was given a $2000.00 per year pay increase.

39. Earlier this month, May 2018, the same Ms McGrath, who had been shocked at what a client had reported to her in the Supervisor's office in Westhampton, in late October 2017, a little over 5 months earlier, by first checking with her supervisors, colleagues and co-workers, was satisfied that Mr Griffin has successfully addressed his issues, and they are now behind him. Ms McGrath, recommended Mr Griffin be hired in a part time capacity at Seafield Westhampton, and in mid May 2018, he began working two evenings during the week, and now also works as a counselor for the Family Program on Sundays, in addition to continuing his Full Time job at Seafield Riverhead. My experience with Ms Doris and Seafield, has been the polar opposite of that which Mr Griffin has been afforded. I have been repeatedly denied any "Reasonable Accommodations," opportunities or benefits, no matter how legitimate they are. It would not be difficult to make a convincing argument that the deficiencies in my work record, are likely less directly damaging to clients well being, which Seafield states is their primary concern, than the behaviors manifested by Mr Griffin, during the months that he and I were employed together at Seafield Riverhead. Specifically, I continue to facilitate a one hour workshop, once per week, for all 100 clients at Seafield Westhampton. I can state with confidence, that if I began a workshop with the words Mr Griffin, reportedly, stated to the clients in his Group, I would not make it to the end of my shift. Nevertheless, Mr Griffin, was named Seafield's "Employee of The Month," earlier this year (2018).

# SECOND CAUSE OF ACTION
## (Retaliation)

1. Clinical Director, Cyndi Milani, returned shortly after Labor Day. In mid September, several Case Managers were reassigned to new work stations. As a result of this re-organization, every male employee at Seafield Riverhead was now assigned to their own, private, one person office in the smaller Building: Sal Sexton, Christopher Ronan, and part time employees, Reggie Morris, and Nurse, J.P. McAdams, who rarely worked at the same time, so effectively, each had a private office; and Mr Griffin, who was assigned to the Group room with the single work station. I remained in the same three person office, in the main buiding.

2. After having been repeatedly told by Ms Doris, for more than three months, "that all work station assignments at Seafield are assigned based strictly on seniority," the person assigned to sit at the work station next to me was, Diane Dannen, a New York State, LCSW. As such, Ms Dannen, was the most Senior, Full Time, QHP (Qualified Health Professional) in Seafield's Riverhead Office, Apart from Ms Doris, Ms Dannen was the only other Full Time QHP authorized by OASAS to sign off on Treatment Plans, and other official documents

3. I was now the only male assigned to the Main Office, the result of which was that the burden of collecting Urine samples, disproportionately fell on me, as there were no other male counselors in the Main Building. Mr Griffin, continued to facilitate his Group in "Room 5." However, he arrived and left according to his Group schedule 9.15am to 12.15pm, and essentially only supervised Urine collection for the males in his own IOS Group. All of the other male staff members rarely had any reason to enter the main building, except to attend the weekly staff meeting on Thursdays from 3.00pm to 4.00pm.

4. In her response to my EEOC filing, Ms Doris states that George Wachsmuth, was available to supervise male toxicologies for ten hours per week. However, Mr Wachsmuth was not in the main building during my shift hours every day. He was available three days per week in the mornings, during my shift, for a total of approximately 5 hours per week. The other five hours he was available to collect Urine samples, was during the afternoon/evening shift, after 4.30pm, which was after my shift had ended. I was scheduled to work 37.5 hours per week. Subtracting 1 hour each weekday, when I was facilitating my Group in the smaller building, I was present in the main building for 32.5 hours per week. Mr Wachsmuth, was only available to supervise urines for 5 hours, during the hours

I was scheduled to work. Which means that for 27.5 hours every week, I was the only male Counselor available to supervise urine collection in the main building. Seafield's client population is two thirds males, and only one third female. I was interrupted throughout my shift.

5. Female co-workers would apologize that they were constantly requesting me to supervise urines for them. Karen Mayer, CASAC-T, stated, "This is crazy, why are they doing this to you?" My two office mates, Diane Dannen, LCSW, and Ellen Recker, MSW, both frequently commented when requests came in rapid succession, "he only just sat down from doing one for someone else."

6. In addition to supervising urines for clients of Seafield Riverhead, there were multiple, random, unscheduled urines that needed to be supervised. Seafield, had a business arrangement with the Riverhead Court complex, a short walk from Seafield Riverhead, whereby Judges and others could refer individuals to Seafield Riverhead, for toxicology testing. These individuals were not Seafield clients, they were individuals who had a variety of legal issues, that required them to be tested. These included individuals with cases that included: Divorce; Child Custody; Domestic Violence; Impaired Driving; among many other issues. These Urine tests were much more time consuming. Each individual had to provide a Urine sample, which I personally had to "Dip Test," twice. Once using a test strip, to test for 12 different substances, including: Amphetamine; Barbiturates; Benzodiazepines; Cocaine; Methamphetamine; Ecstasy; Morphine/Opiates; Methadone; Phencycliidine, Cannabinoids; and Oxycontin. In addition I had a separate strip to test for Bupenorpherine. I was legally required to explain to the individual - many of whom had never experienced supervised urination, and had difficulty urinating in view of another person, which also made the process even more time consuming - how the test worked. I was then required to discuss the results with them, and show them how certain substances may have come up positive, meaning they had measureable amounts of those substances in their system. Some individuals accepted the results, others would argue that they disagreed that the color strip displayed was indicative of a positive result, and that I was seeing a different color to the one they observed, and further discussion would ensue. In fact most of the urine collections I was asked to supervise during the day - outside of the morning and early evening hours – were those that required "Dip Tests," as Seafield clients present outside of Group hours were usually being referred to a "Higher Level Care," were suspected of relapsing or using Alcohol or Drugs; were being admitted either to Seafield Riverhead, or to Seafield Westhampton, and were being assessed at Seafield Riverhead first; or were being discharged from Seafield Riverhead, because they had completed treatment, all of which required "Dip Testing."

7. When I first began supervision with Mr Sexton, I requested another, what I considered to be, "Reasonable Accommodation." I told Mr Sexton, that I was resigned to the fact that I would be remaining in the same office I'd always been in. However, with this burdensome, random, unscheduled, Toxicology schedule that I was now being subjected to, I requested relief. Specifically, I requested that some sort of schedule be created, to share this responsibility more evenly between all the male counselors. I suggested that since a schedule already existed, with Mr Wachsmuth, supervising urine collection during specifically posted hours, that everyone was aware of, that all male counselors be assigned specific times when they would be responsible to perform that task, as I was the only doing it.

8. At this time, Mr Sexton, a 30 year old young married father, whose promotions at Seafield Riverhead rested entirely in Ms Doris's hands, chose to share with me that he was a former client of Seafield himself. He stated that after he completed Rehab in Westhampton, he moved into Seafield's Riverhead Sober House, and attended Out Patient Treatment in the Main Building. Mr Sexton, confirmed that Ms Doris had been the Executive Director of Seafield Riverhead at that time, as she continued to be. SAMHSA's "Clinical Supervision" guidelines regarding "Dual Relationships," states, "Guidelines for supervisory relationships prohibit supervising current or former clients (a difficult issue in the substance abuse field where it is not uncommon for an agency to hire and supervise former clients in recovery)." Not only is this a violation of the codes of conduct for Social Workers, it was clear to me that Mr Sexton was letting me know that there were significant limits to the assistance he may be able to provide to me as my supervisor, as not only was I the first person he had ever supervised, he was in an unequal power relationship, on which his livelihood also depended. I asked him simply to please see if he could arrange a, "Reasonable Accommodation," for me to have at least two hours each afternoon when I would not be interrupted, so that I could complete my work. He was unable to do so.

# THIRD CAUSE OF ACTION
## (Labor Law)

1. After I was hired in my new full time position at Seafield Out Patient in Riverhead, I continued to work in my part time position at Seafield Center in Westhampton, I was now, regularly, working more than forty hours per week. I recall being told by both Ms Doris and Mr Schaefer, that even though I am a "Non-Exempt," worker, I did not qualify for any Overtime Pay.

2. It was explained to me that Seafield Center Inc., which is the In Patient Facility in Westhampton Beach; and Seafield Services Inc., which is comprised of Seafield's six Out Patient facilities, and various Sober Houses, are two separate and distinct companies. As a result, overtime pay was not applicable. I received two separate pay checks, one from Bridgehampton National Bank for my job in Westhampton; the other from Chase for my job in Riverhead. This did not make much sense to me. Myself, and my other co-workers, who also worked in two locations, used our employee photo ID's, which we wore around our necks, from the location at which we were hired first. For example, a person hired to work at Seafield Riverhead, would have an ID identifying themselves as a Riverhead employee, however, if they subsequently were hired to work part time in Westhampton, in addition to their full time job, they used their same Riverhead ID, when they were working in Westhampton. All of Seafield's computer systems are centralized. I used the same log in and password to bring up my personal desk top; access to both my Seafield email account, my access to "Avatar," the Electronic Medical Record system, and the ADP employee website. All are identical, whether I logged in in Westhampton or Riverhead. The phone system is centralized, whereby any employee could call any other employee at any of Seafield's facilities, by simply dialing their four digit extension. The address for both Seafield Center Inc. and Seafield Services Inc., is exactly the same, 7 Seafield Lane, Westhampton Beach, NY 11978. The Human Resources Department and other Senior Management functions have the same personnel for both "companies," and are all located at Seafield's offices in Westhampton. Every month, Seafield announces an, "Employee of The Month," it facilities. Even though there are supposedly two separate companies, only one individual is selected, as, "Employee Of The Month," for the entire organization. One of the benefits of working part time in Westhampton in the evenings and/or weekends, was that you could catch up on any unfinished notes from your Full Time day job at Seafield's Out Patient facilities, during any "down time" during your Part Time hours. This "benefit" was touted by the supervisor's of the evening & weekend staff, and at various times, everyone to whom it was relevant took advantage of it. Seafield functions as a seamless self referral system. In my job at Seafield Riverhead, I would complete an Assessment with an in coming client, who was being referred to Seafield Westhampton later that day. On several occasions, later that same day, I would complete the Admission process into the In Patient Rehab in Westhampton, with the same client. A similar process happened in reverse, whereby clients I worked with in the Rehab in Westhampton, were discharged to reside in Seafield's Sober House in Riverhead, and attend Out Patient Treatment, at Seafield's Riverhead location, as a client on my personal case load.

3. At some point in 2016, an employee at Seafield Out Patient in Medford, reportedly sued for unpaid overtime, because he was required, on occasion, without notice, to work through his lunch hour, if an unscheduled, potential client, asked for assistance, which necessitated a counselor conduct an Assessment. This type of information was often discussed at the employee's table in the dining area in Westhampton. Various employees expressed the hope that this incident, which, reportedly, resulted in the back overtime being paid in full, to the worker in question, would lead to a review of the policies regarding Seafield's two separate companies, that resulted in workers receiving no Overtime pay, for working more than forty hours per week. It did not.

4. I was personally told, during an interview with the Clinical Director at Seafield Westhampton, in December 2017, that if I were hired for a Full Time Position, I would have to quit my part time job as part of the evening & weekend staff, at Seafield Westhampton. I enjoy working at the In Patient facility, and having become proficient at my assigned responsibilities, it appeared counter productive to terminate a workers part time job, simply to avoid paying Overtime, especially since the Supervisors were permanently advertising, and looking for suitably qualified individuals to fill those positions.

5. In May 2018, an employee who had been working full time in Westhampton, and part time in Riverhead, had to give up their part time position in Riverhead, thereby losing income, when they were hired to work full time in Riverhead, as to remain in both positions would result in Seafield having to pay Overtime.

6. The Evening and Weekend Supervisor's passed onto to staff a warning from Senior Management, that if we were viewed on the security cameras leaving our scheduled shift, ten or fifteen minutes early, or improperly recording hours worked on our timesheet, these actions would considered to be, "a fireable offense," as they are deemed to be "stealing" from the company, and would identify the perpertrator as a, "thief." Since Seafield is a "Twelve Step," based program, based on the Alcoholic's Anonymous, "Big Book," which is rooted in, "doing the right thing," such behavior was stated as being contrary to the principles of the entire organization, and to the ethics and morals of our professional license's.

7. The practical reality is that Seafield identifies and describes itself as one entity, referring to itself as the, "Seafield Family," as stated in the employee handbook. The one and only time Seafield claims to be two separate Employers, is regarding Overtime. For example, I would sign my Timesheet in Riverhead at 18-

8.00am, and sign out at 4.30pm. I would then drive to Westhampton, and sign in on my Timesheet there at 5.00pm or 5.30pm, and sign out at 11.00pm. When I signed into my shift at Westhampton, I was starting a brand new shift for a different company, therefore the "clock" was automatically reset to zero, the seven and half hours I had already worked that day were for a different company, therefore did not qualify for Overtime pay. Seafield Center Inc., the original company in Westhampton, changed one word in its name to Seafield Services, became incorporated, opened a second bank account with Chase, and by this simple act, were no longer required to pay Overtime.

8. When I began working in Westhampton, I quickly became aware of pay inequities among the staff. For example, as a male trainee, with basically no experience, I was paid $16.00 per hour, whereas, the female employee I was assigned to "shadow" to learn how to do my assigned work, was being paid $13.00 an hour, even though she was a full CASAC, and a full time Supervisor at one of Seafield's Out Patient facilities, plus she had been employed at Seafield for approximately eight years at that time. As an "At Will" employee she was afraid to ask for a pay increase.

# FOURTH CAUSE OF ACTION
## (Loss of Benefits & Entitlements)

1. As a result of the termination of my employment, my spouse and I immediately lost both our Health and Dental Insurance coverage, on the day I was fired, 12/02/2016. Our combined monthly COBRA payment for both policies was $1,972.74.

# FIFTH CAUSE OF ACTION
## (Breach of Contract)

1. During the entire time I was employed at Seafield Riverhead, Ms Doris and Seafield provided almost none of the services and support, listed in all of the various Contracts, both actual and Implied. These included Seafield's Employee Handbook; OASAS Regulations; SAMHSA Rules; the Codes of Conduct pertaining to both an LCSW and a CASAC. I did not receive training from Ms Dammann, on "Avatar," that others received, nor did I receive the appropriate and mandated OASAS Supervison. This constitutes all of the following: *"Breach Of Contract;" "Breach Of Implied Contract;" "Negligent Misrepresntation;" "Breach Of Good Faith & Fair Dealing;" and "Setting Up To Fail."*

# SIXTH CAUSE OF ACTION
## (Prima Facie Tort: Intentional Infliction of Emotional Distress)

1. During almost all of our supervision meetings, Ms Doris, criticized me for, talking too much, and being disorganized. She not only did this in private, she would make these same statements in public to my co-workers. On the first day Diane Dannen – a person I had never met until that moment - was assigned to the work station directly next to me, Ms Doris accompanied her into our office, and by way of introduction, said, "Don't talk to him, he talks too much, you won't get anything done if you do. Wait until you've finished all your work before you talk to him." That was in early September 2016.

# SEVENTH CAUSE OF ACTION
## (False Claims)

1. At end of the first weekly staff meeting I ever attended at Seafield Riverhead, various documents were passed around for all of the attendees to sign. One of the documents I recognized from my experience working at another OASAS Out Patient facility in Harlem. It listed the names of approximately eight clients. Ms Doris, instructed us all to sign it, and stated, "make sure you all put your licenses after your names." I turned to the person sitting next to me, and said, "we didn't do any of this," referring to the fact that the regulations required that only those clients that were discussed as part of a "Multi Disciplinary Case Conference" meeting would be signed off on. She replied, "we never do any of that, we all just sign it."

2. After I had been fired from Seafield Riverhead, I mentioned this to my supervisor, Mr Schaefer, during our supervision session, during the second week of December 2016, which was the supervisor review of the successful completion of my first full year, working at Seafield Westhampton. I reminded Mr Schaeffer of this False Documentation practice a second time in Summer 2017, immediately prior to Mr Schaeffer's reassignment to Seafield Riverhead, where he was promoted to Clinical Director. A short time after he began working there, my supervisor at Seafield Westhampton, Ms McGrath, who was also still working at Seafield Riverhead, referring to Mr Schaeffer, told me, "now Craig's there we've started discussing individual clients at the staff meeting for the first time ever." Another of my co-workers, Mr Ronan, said, "I had no idea we were supposed to discuss client's cases."

3. In late September 2016, Ms Doris, requested my username & password for the Electronic Medical Record, "Avatar," and against my wishes, began logging in as me, and writing notes in individual client's charts, many of whom were mandated to treatment by the Criminal Justice System – Parole, Probation, Drug Court, CPS – or had received a DWI and were required to complete treatment to be able to get their Driver License reinstated. I registered my objection to Ms Doris, as any of these are HIPAA protected records which could be requested for a Court Case, and those records follow my personal license, even if I am no longer working at Seafield. I am assumed to be the sole author of everything linked to my license. Ms Doris, registered my objection, and stated that she would be signing in as me anyway. The terms of my employee contract with Seafield,

stipulate that I must provide my username & password to the Executive Director, upon request.

4. During the same meeting with Mr Schaeffer, immediately before he transferred to Seafield Riverhead, I reported that Ms Doris had regularly logge in as me on, "Avatar." Mr Schaeffer, replied that he recalled one of the part time supervisor's who occasionally works for him, Gina D'Ullisse, reporting the same activity. Ms D'Ullisse, had also been employed at Seafield Riverhead for several years, in the past.

Ironically, on the same day that I was fired from Seafield Riverhead, I received a congratulatory letter in my personal mailbox, from Human Resources, together with a metal "Seafield" pin, indicating successful completion of my first full year as an employee, as my first day of work at Seafield Westhampton, had been 02 December 2015.


# EIGHTH CAUSE OF ACTION
## (Disparate Treatment)

1. As noted elsewhere in this Amended Complaint, I was subjected to "Disparate Treatment," experiencing "Unequal terms and conditions of my employment." These include, being required to take and pass the CASAC Exam, while working part time, when other new hires were not required to do so, whether they were hired part time or full time.

2. Others were granted their request to move to different work stations, even though they were not asking for a "Reasonable Accommodation." These included, but were not limited to, both of my office mates, Ms Dankievich & Ms McGrath; and also Mr Griffin.

3. In addition, Seafield Westhampton routinely provided extensive training for trainee counselors, which included "shadowing" a more experienced counselor for weeks, often for more than a month, until the trainee was able to comfortably work directly with clients. This was not provided for me.

4. On 10/26/2016, Ms Doris asked me to sign an, "Employee Warning Report." Within in days of signing that "warning," to be the best of my recollection, two days later, on 10/28/2016, Ms Doris, arranged for an In House Training on "Avatar," the Company's EMR keeping system, facilitated by Ginger Dammann,

Seafield's Head of Records & Technology, for all "recent" hires. I was the only "recent" hire not included in the training. I asked Ms Doris why I was not included, she told me, "you should know how to do this by now." All of the other staff members who were included in the training were significantly more experienced than I, and all had Master's Degrees, most had either an LCSW (Licensed Clinical Social Worker) or LMHC (Licensed Mental Health Counselor).

5. As I knew Ms Dammann, and had received training from her shortly after I was hired in Westhampton, I asked her if she knew why I was not included in the training. She said, referring to Ms Doris, "didn't put you on the list." Ms Dammann, said, "you only got part of the In Patient training which Craig (referring to Mr Schaeffer, requested for you), you can get the Out Patient training any time, Lynn just has to request it for you. You can do it in Westhampton, just like you did before. Lynn knows that, she's done several trainings there herself."

Ms Doris, having confirmed to me that my omission from training was not an oversight, but deliberate, coming within days f my being asked to sign a "Warning," lead me to conclude that the lack of support I'd been experiencing, was continuing.


# NINTH CAUSE OF ACTION
## (Hostile Work Environment)

I considered Ms Doris's actions towards me as creating a Hostile Work Environment. I was regularly criticized for talking too much, and for being disorganized, both symptoms of ADD/ADHD, which Ms Doris is a licensed expert in diagnosing.  In addition, I was responsible for supervising the majority of the male urine collections, every day.

During my last week of employment, at which time Ellen Recker sat at one of the work stations in our shared office, I earned that my replacement, Howard Tieger, had just come in for a final interview. Ms Recker, shared with me that the front office, "Administrative" staff had each written a date on the back of a one dollar bill, together with their name, and put all the bills into an envelope. The date in question was each person's guess as to how long Mr Tieger would last, either because he got fired, quit, or simply, "couldn't take it any more." That is an indicator of the overall mood in the office at that time, the last week of November 2016.

## TENTH CAUSE OF ACTION
### (Harrassment; Disability Harrassment)

As stated previously, during almost all of our supervision meetings, Ms Doris, criticized me for, talking too much, and being disorganized. She not only did this in private, she would make these same statements in public to my co-workers. On the first day Diane Dannen – a person I had never met until that moment - was assigned to the work station directly next to me, Ms Doris accompanied her into our office, and by way of introduction, said, "Don't talk to him, he talks too much, you won't get anything done if you do. Wait until you've finished all your work before you talk to him."

## ELEVENTH CAUSE OF ACTION
### (Demotion)

The direct result of my termination from my position at Seafield Riverhead, was that I was no longer a Case Manager. I now simply worked Part Time, without Health and Dental Benefits for my wife and Spouse, completing Bio Psycho Socials, and facilitating a weekly one hour Group for approximately 100 clients each week at Seafield Westhampton.

## TWELTH CAUSE OF ACTION
### (Age Discrimination)

As previously noted, I was required to take and pass the CASAC Exam, while working part time, when other new hires were not required to do so at all, whether they were hired part time or full time.

## THIRTEENTH CAUSE OF ACTION
### (Making False Statements To A Federal Agency)

There are several, at best, "miss statements, in Ms Doris's, response to my EEOC filing – a Federal Agency - signed by Seafield's Attorney, Paul J. Siegal, of Jackson Lewis P.C. Ms Doris was not aware of my diagnosis of ADD/ADHD when she hired me, as she later told me that she had not seen my employee file, as I had been hired first in Westhampton, and my file in HR's offices at that

location. Therefore the "Same Hire/Same Fire," theory does not apply. In addition, the EEOC states that an individual can request a "Reasonable Accommodation," at any point during their employment, if the circumstances they are placed in necessitate it. Attempting to make a comparison between an individual who is consistently and continuously African-American throughout their employment is irrelevant, as their ethnicity obviously will not change during their employment. However, the symptoms of ADD/ADHD obviously can change dramatically, subject to the specific conditions a person with that diagnosis is placed under, which, logically, would then very likely require a "Reasonable Accommodation," to provide relief. That is the reason a person can make such a request for a "Reasonable Accommodation," at any time.

Ms Doris's assertion that her repeated denials of my request for a "Reasonable Accommodation," are due to the fact that, as stated, "Mr Elgar, required more supervision and monitoring than any counselors employed at Seafield Riverhead at that time," is disingenuous at best. Ms Doris was "deliquent" and "derelict in her duty," according to SAMHSA's definitions of the requirements of supervisors, as she made no attempt to provide any supervision for at least the first three months I was employed at Seafield Riverhead.

Ms Doris goes on to state that the reason she did not grant my request to move to the smaller building, was because, "There was no supervisor in that building." This is demonstrably false. I was not assigned a personal supervisor until after Labor Day 2016, around the time that Ms Doris instituted her reorganization of the office, and the work stations were various individuals would be sitting. My supervisor, Mr Sexton, was assigned to the smaller building, where Ms Doris states there was no supervisor. Prior to that time, her assertion that there was no supervisor in that building is irrelevant, as I was not receiving any supervision anyway.

Ms Doris, states that, "Mr Elgar was given fewer drug screening responsibilities…" This is also demonstrably false. Two days before Ms Doris fired me, I wrote an email to my supervisor, on Wednesday 30 November 2016, as I had supervised five separate urine collections that day, all of them, "Dip Tests." I repeating my request for some kind of relief from the constant interruptions I was being subjected to, with request to supervise urine collections. Mr Sexton, had already written an email to all staff, including Ms Doris, which requested everyone, "to please stop asking the same person, to do tox's all the time." It was known that Mr Sexton was referring to me as that, "same person."

During my "termination" meeting with Ms Doris, at which Ms Klein was also present, on 12/02/2016, Ms Doris told me, "the work load is just too much for you, I'm sorry, but you cannot cope, so I have to let you go." I responded to Ms

Doris that I had caught up on all my work, and would have been able to accomplish all more efficiently, if I had not been subjected to supervising so many urine collections. I referenced the five "Dip Tests," I had to do two days earlier. Ms Doris, replied, "I had an email sent out," referring to an email Mr Sexton had sent out, on her behalf. I told her, "I know, but you and I both know that it has never been adhered to, and you have never enforced any part of it." Ms Doris, replied, "Oh well, it's too late now."

Ms Doris, states that I, "elected to move to another desk without drawers," and that I was, "provided with a two drawer cabinet." She continues, "Mr Elgar did not request additional furniture or items to better organize his workplace." After Ms Doris allowed Ms Dankievich to move out of our office and move to another work station, I believe she took the drawers that were a separate part of desk with her, to her new work station. After Ms Doris denied my request for a "Reasonable Accommodation," I asked permission to move to Ms Dankievich's now vacant desk, as my desk was in full view of everyone by an open door, directly next to one of the main supply closets that housed both the medical drop boxes for Urine sample, and other supplies accessed daily by staff to perform that assigned duties. Ms Dankievich's desk was in the center of the office, faced a wall, and had less distractions. Ms Doris, allowed to move to that desk. Ms Doris criticized me for being disorganized. I requested desk drawers, she personally asked office manager Michelle Orlando to order drawers for me. Ms Doris also instructed me to send an email to Ms Orlando, to formally request desk drawers. None were ever delivered, neither was a two drawer file cabinet ever made available. Instea, I bought two large plastic snap top bins from my home, to use for storage. After Ms Doris fired me, she came into my office to supervise me packing up my belongings, and personally observed the two plastic bins. It was the end of the day, and she wanted to leave. So I returned the following Monday afternoon, where I was supervised, packing my belongings, by Ms Klein, who also observed the plastic bins I had been using for storage.